## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| AMERICAN HOME ASSURANCE COMPANY, | § § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-2105 |
| | § | |
| OCEANEERING INTERNATIONAL, INC., | § § | |
| Defendant. | § § | |

## <u>MEMORANDUM AND ORDER</u>

Pending before the Court in this declaratory judgment action is Defendant Oceaneering International, Inc.'s ("Oceaneering") Motion for Summary Judgment [Doc. # 18]. Plaintiff American Home Assurance Company ("American Home") has responded [Doc. # 25] and Oceaneering has replied [Doc. # 25]. American Home has also filed a Motion for Summary Judgment [Doc. # 20] to which Oceaneering has responded [Doc. # 23]. American Home has not replied, and the deadline to do so has passed.[1] Upon request of the Court, American Home and Oceaneering have also submitted supplemental briefing [Docs. # 34, # 35, and # 37]. Having reviewed the parties' submissions, all pertinent matters of record, and applicable law, the Court

---

[1] *See* HON. NANCY F. ATLAS, COURT P. 6(A)(4), *available at* http://www.txs.uscourts. gov/district/judges/nfa/nfa.pdf.

concludes that Oceaneering's motion should be **granted in part and denied in part** and American Home's motion should be **denied**.

In addition, pending before the Court is Oceaneering's Motion to Strike Experts [Doc. # 26], which is alternatively, a Motion in Limine.   American Home has responded [Doc. # 28] and Oceaneering has replied [Doc. # 30].   The Court did not rely upon the challenged evidence in reaching its holdings herein.   Accordingly, Oceaneering's motion is **denied as moot**, but may be reasserted if the challenged evidence is expected to be presented at trial.

## I.   FACTUAL BACKGROUND

In 2002, Okeanos Gas Gathering Company, LLC ("Okeanos"), a corporation formed by companies Shell and BP, obtained a pipeline right-of-way from the U.S. Department of Interior Minerals Management Service ("MMS") to construct a pipeline along the Outer Continental Shelf on the ocean floor in the Gulf of Mexico. During the pipeline application process, an contractor hired by a Shell affiliate discovered along the right-of-way an 18th century shipwreck, potentially protected by the National Historic Preservation Act, 16 U.S.C. § 470 *et seq*., but failed to timely inform MMS of the discovery in violation of federal law.[2]   Instead, Okeanos,

---

[2]   In accordance with MMS regulations, Okeanos, as holder of a permitted right-of-way on the Outer Continental Shelf, was charged with the duty to protect any potentially significant historical resources discovered along the right-of-way. MMS regulations (continued...)

apparently unaware of the contractor's discovery, informed MMS that it had located an unidentified sonar contact and agreed to lay the pipeline a specified distance from the site. However, MMS subsequently learned of the discovery of the shipwreck and the failure of Okeanos or its contractor to timely notify the agency.  MMS promptly entered into discussions with Okeanos regarding the proper protection of the site.

In 2004, while these discussions were ongoing, Defendant Oceaneering, a provider of engineering services and products,  contracted with Okeanos to conduct an inspection of the Okeanos pipeline in the aftermath of Hurricane Ivan. Oceaneering, unaware of the existence of the protected archeological site, noted a sonar contact, located the site, and decided to inspect with a remotely operated vehicle ("ROV")—an unmanned underwater vehicle equipped with robotics and tethered to a vessel from which it is operated.   During the course of this inspection, Oceaneering's ROV operator, Travis Lee Kolbe, disturbed and destroyed several shipwreck artifacts, primarily glass bottles, but also an "octant"—an 18th century navigational instrument—which was brought on board Oceaneering's vessel, but subsequently tossed back to the sea.

---

[2]     (...continued)
provide that upon discovery of a potentially significant historical resource, "the right-of-way holder shall immediately halt operations within the area of the discovery and report the discovery to the Regional Director [of MMS]," who will then inform the permit holder how best to protect the site.  *See* 30 C.F.R. § 250.1010(c)(4).

Because of Okeanos' failure to timely notify MMS of its discovery of the shipwreck, and because of the subsequent disturbance of the site by Okeanos's contractor, Oceaneering, Okeanos entered into an agreement with the agency whereby it would be relieved of all civil, administrative, and criminal liability in return for its promise to pay $4.87 million to Texas A&M University for historical preservation of the site.[3]   Okeanos then threatened litigation and made a demand upon Oceaneering for recovery of these payments, alleging that under its contract with Oceaneering, the "Master Diving Contract," Oceaneering agreed to indemnify Okeanos for "all damages to or losses of Third Parties' property . . . caused by or resulting from the

---

[3]   Specifically, the University agreed to "perform project planning, data recovery, conservation, curation of artifacts[,] and historical research of the shipwreck to the satisfaction of the [MMS]."  *See* Joint Statement of Undisputed Facts [Doc. # 17], ¶ 62; *see also* Plaintiff's Motion for Summary Judgment [Doc. # 20], Exh. D: "Texas A&M University Research Agreement," at 9–13. This included, but was not limited to, extensive recovery and conservation of artifacts, with the goal of preparing them for permanent curation and display and historical research of the site to "include a detailed historical outline of . . . commerce shipping in the Gulf of Mexico between the mid-eighteenth and nineteenth centuries, a detailed review of ships[,] ship architecture, and ship types that were in common use in the Gulf of Mexico and in the Atlantic Ocean in general between the eighteenth and nineteenth centuries, along with sketches, ship designs, sclantlings, sail plans, rigging systems[,] and equipment." Joint Statement of Undisputed Facts [Doc. # 17], ¶¶ 74–75; Plaintiff's Motion for Summary Judgment [Doc. # 20], Exh. D: "Texas A&M University Research Agreement," at 12.  The University also agreed to use the Okeanos funds to create a "professional 45-minute broadcast quality film detailing the project from conception through preliminary conservation," provide a website with daily updates during the collective stage of the project, prepare displays for the State of Louisiana and the University, facilitate a "press day at sea," produce an educational booklet for the State of Louisiana's anthropological study series, and provide three research fellowships for graduate students pursuing advanced degrees in archaeological oceanography. *See id.* at 8.

negligence or fault of [Oceaneering] . . . ."[4] Oceaneering and Okeanos ultimately settled this dispute for $3 million worth of fully-crewed ROV time, based on market rates at the time of the release for the work.

Upon learning of the threatened lawsuit, Oceaneering contacted its general liability insurer, Associated Electric & Gas Insurance Services Limited ("AEGIS"), and its excess liability insurer for this claim, Plaintiff American Home, seeking indemnification.  AEGIS agreed to indemnify Oceaneering for $1 million, consistent with Oceaneering's policy limits.  American Home, in contrast, denied coverage and filed this suit, seeking a declaration that its policy with Oceaneering does not afford coverage under these facts.  Specifically, American Home asserts that AEGIS improperly provided coverage and, alternatively, that the damage at issue (the "Okeanos claim") does not qualify as "property damage" arising from an "occurrence," as those terms are defined in its policy with Oceaneering.  Oceaneering counterclaimed, seeking a declaration that coverage is due.[5]

---

[4]     *See* Defendant's Motion for Summary Judgment [Doc. # 18], Exh. A: "Master Diving Service Contract," at 5–6.  "Third Parties" are defined as "all persons who are neither [Okeanos] or [Oceaneering]."  *Id.* at 5.  This provision of the Master Diving Service Contract further provides that "in the event of joint or concurrent negligence or fault of [Oceaneering] and [Okeanos], [Oceaneering's] indemnification obligation hereunder shall be limited to its allocable share of such joint or concurrent negligence or fault."  *Id.* at 6.

[5]     In its Motion for Summary Judgment, Oceaneering also asserts a claim for damages under Sections 542.051–.061 of the Texas Insurance Code.  However, Oceaneering
(continued...)

## II.    LEGAL STANDARD

### A.    Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who

fails to make a sufficient showing of the existence of an element essential to the

party's case for which that party will bear the burden at trial.[6]  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th

Cir. 1994) (en banc); *see also Baton Rouge Oil & Chem. Workers Union v.*

*ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).  In deciding a motion for

summary judgment, the Court must determine whether "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with any affidavits filed

in support of the motion, show that there is no genuine issue as to any material fact

---

[5]    (...continued)

raised no such claim in its Counterclaim. *See* Answer to Plaintiff's Original
Complaint and Counterclaim for Declaratory Judgment [Doc. # 5]. Therefore, the
issue is not properly before the Court. *See Wimm v. Jack Eckerd Corp.*, 3 F.3d 137,
142 (5th Cir. 1993) (holding that a claim not raised in a complaint was "never before
the district court"); *see also Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 114 (5th Cir.
2005) (citing *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)) ("A
claim which is not raised in the complaint but, rather, is raised only in response to a
motion for summary judgment is not properly before the Court."). In any event,
marine insurance policies, such as the one at issue here, are not covered under these
provisions of the Texas Insurance Code. *See* TEX. INS. CODE § 542.053(a)(5).

[6]    *See infra* Part II.B (discussing the burdens borne by each party in a insurance contract
dispute).

and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Hart v. Hairston*, 343 F.3d 762, 764 (5th

Cir. 2003).

 For summary judgment, the initial burden falls on the movant to identify areas

essential to the non-movant's claim in which there is an "absence of a genuine issue

of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).

The moving party, however, need not negate the elements of the non-movant's case.

*See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  The moving

party may meet its burden by pointing out "'the absence of evidence supporting the

non-moving party's case.'" *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312

(5th Cir. 1995) (quoting *Skotak*, 953 F.2d at 913).  Similarly, where the movant bears

the burden of proof at trial on an issue at hand, it "bears the initial responsibility of

demonstrating the absence of a genuine issue of material fact with respect to [that]

issue[]." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718 (5th Cir. 1995); *see also*

*Lincoln Gen. Ins. Co.*, 401 F.3d at 349.  However, if the moving party fails to meet its

initial burden, the motion for summary judgment must be denied, regardless of the

non-movant's response.  *ExxonMobil Corp.*, 289 F.3d at 375.

 If the moving party meets its initial burden, the non-movant must go beyond the

pleadings and designate specific facts showing that there is a genuine issue of material

fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the non-moving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). However, factual controversies are resolved in favor of the non-movant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002) (noting that unsworn pleadings do not constitute proper summary judgment evidence). Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). Instead, the non-moving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.*

In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Finally, "[w]hen evidence exists in the summary judgment record but the non-movant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *See id.* (internal citations and quotations omitted); *see also De la O v. Hous. Auth. of El Paso*, 417 F.3d 495, 501 (5th Cir. 2005).

### B.    Insurance Policy Interpretation

Texas law governs the interpretation of an insurance policy. *See Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 886 (5th Cir. 1991). Where parties are seeking a declaration regarding coverage under a policy, "the insured bears the burden of showing that the claim against it is potentially within the policy's coverage, [while] the insurer bears the burden of establishing that an exclusion in the policy constitutes an avoidance of or affirmative defense to coverage." *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins.*, 99 F.3d 695, 700 (5th Cir. 1996) (citing *Sentry Ins. v. R.J.*

*Weber*, 2 F.3d 554, 556 (5th Cir. 1993)); *see also United Nat'l Ins. Co. v. Hydro Tank, Inc.*, 497 F.3d 445, 448 (5th Cir. 2007) (citing *Lincoln Gen'l Ins. Co. v. Reyna*, 401 F.3d 347, 350 (5th Cir. 2005)).

Under Texas law, the meaning of an insurance policy is to be determined by the standards applicable to contracts generally. *See Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 491 (5th Cir. 2000); *Cicciarella v. Amica Mutual Ins. Co.*, 66 F.3d 764, 767–68 (5th Cir. 1995); *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 740–41 (Tex. 1998); *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987). In construing a contract for insurance, a court's "primary goal . . . is to give effect to the written expression of the parties' intent." *Balandran*, 972 S.W.2d at 741; *see also TIG Specialty Ins. Co. v. Pinkmonkey.com Inc.*, 375 F.3d 365, 369 (5th Cir. 2004) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994)).

Where "a written contract is so worded that it can be given a definite or certain legal meaning," then it is unambiguous. *Kelley-Coppedge, Inc. v. Highlands, Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). A court may not vary the terms of an unambiguous contract, which are to be given their plain and ordinary meaning. *See Am. Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 329 (5th Cir. 2001) (citing *Canutillo*, 99 F.3d at 701); *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984). "A contract is ambiguous only 'when its meaning is uncertain and doubtful or it is

reasonably susceptible of more than one meaning.'"  *Cicciarella*, 66 F.3d at 768

(quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)).  However, "[t]he fact

that the parties disagree as to coverage does not create an ambiguity." *Sharp v. State

Farm Fire & Cas. Ins. Co.*, 115 F.3d 1258, 1261 (5th Cir. 1997); *Forbau*, 876 S.W.2d

at 134.  "While parol evidence of the parties' intent is not admissible to create an

ambiguity . . . the contract may be read in light of the surrounding circumstances to

determine whether an ambiguity exists." *Balandran*, 972 S.W.2d at 741 (citing *Nat'l

Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995); *Columbia Gas

Transmission Corp. v. New Ulm Gas, Let.d*, 940 S.W.2d 587, 589 (Tex. 1996)).

"Whether a contract is ambiguous is a question of law that must be decided by

examining the contract as a whole in light of the circumstances present when the

contract was entered." *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589; *see

also Cicciarella*, 66 F.3d at 768; *Yancey v. Floyd West & Co.*, 755 S.W.2d 914, 917

(Tex. App.—Fort Worth 1988, writ denied).

 If a court finds that terms in a contract are ambiguous and subject to more than

one reasonable interpretation, the relevant language is to be "interpreted in favor of

coverage for the insured." *Lambrecht & Assocs., Inc. v. State Farm Lloyds*, 119

S.W.3d 16, 20 (Tex.App.—Tyler 2003, no pet.) (citing *Grain Dealers Mut. Ins. Co.

v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997)); s*ee also Certain Underwriters at

*Lloyd's London v. C.A. Turner Constr. Co., Inc.*, 112 F.3d 184, 186 (5th Cir. 1997);

*Tex. Dep't of Hous. & Cmty. Affairs v. Verex Assurance, Inc.*, 68 F.3d 922, 928 (5th

Cir. 1995); *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555

(Tex. 1991).  Thus, exceptions and limitations in a policy are construed strictly against

the insurer and the court is to "'adopt the construction of an exclusionary clause urged

by the insured as long as that construction is not itself unreasonable, even if the

construction urged by the insurer appears to be more reasonable or a more accurate

reflection of the parties' intent.'" *Canutillo*, 99 F.3d at 701 (quoting *Barnett v. Aetna

Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987).

## III.   <u>ANALYSIS</u>

Two provisions of the American Home insurance policy are implicated in this

case.  The first purports to provide excess coverage for claims "covered by" an

underlying policy of insurance—here, the AEGIS policy.  The second provision

provides coverage for losses due to "property damage . . . caused by or arising out of

[an] occurrence."  Specifically, "Part B" of the American Home policy states:

I.      Coverage

This policy is to Indemnify the Assured [Oceaneering] in respect
of the following . . . :

(a)     All Protection and Indemnity, Marine Liabilities and other
risks of whatsoever nature as covered by the underlying
insurance declared in the Schedule of Underlying

Insurance.

* * * *

(c)     All other sums which the Assured [Oceaneering] shall
        become legally liable to pay or by contract or agreement
        become liable to pay in respect to claims made against the
        Assured for damages of whatsoever nature, on account of:

        i.      Personal Injuries;
        ii.     Property Damage;
        iii.    Advertising Liability;

        caused by or arising out of each occurrence happening
        anywhere in the world.

        Except as expressly stated within, coverage as is afforded under
        Insuring Agreement I(a) . . . shall follow the insuring conditions
        of the underlying insurance.[7]

For the reasons discussed below, the Court concludes that the American Home

policy does afford coverage for the claim at issue here.  However, material questions

of fact remain as to the scope of coverage.

**A.      Existence of Coverage**

**1.      Coverage Theories**

A primary position advanced by Oceaneering concerns the relationship between

AEGIS—Oceaneering's general liability insurer for the claim at issue in this

---

[7]     *See* Plaintiff's Motion for Summary Judgment [Doc. # 20], Exh. H: "American Home
        Insurance Policy," at Bates No. AIHOPM-044-0000348.  (The policy is not separately
        paginated.  All citations are to the Bates stamps located on the copy of the policy
        provided with American Home's Motion for Summary Judgment.)

case—and American Home—Oceaneering's excess liability insurer for this claim.
Oceaneering asserts that American Home provided a "following form" policy whereby
the company is bound to provide excess coverage for any claim deemed covered, and
paid, by AEGIS.[8]   American Home disputes this position, arguing that it is only
obligated, pursuant to Section I(a) of its policy with Oceaneering, to provide payment
for losses *properly* covered by the underlying policy of insurance.  American Home
asserts that AEGIS improperly tendered payment on this claim, and hence, that it is
not obligated to indemnify Oceaneering merely because of AEGIS's allegedly
incorrect decision.

        American Home's construction of the following form provision is well taken.
The "following form" provision of the American Home policy states that coverage is
provided for risks "as covered by,"and "shall follow the *insuring conditions* of" the
AEGIS policy.[9]  The policy does not state that coverage is provided for losses "as paid
by" the AEGIS policy.  Neither party has pointed to, and the Court has not identified,
any language in the American Home policy, or case law, suggesting that American
Home's obligations *automatically* flow from AEGIS's coverage *decisions*.  Indeed,

---

[8]     *See* Answer to Plaintiff's Original Complaint and Counterclaim for Declaratory
        Judgment [Doc. # 5], ¶¶ 16–17.

[9]     *See* Plaintiff's Motion for Summary Judgment [Doc. # 20], Exh. H: "American Home
        Insurance Policy," at Bates No. AIHOPM-044-0000348 (emphasis added).

in the analogous context of reinsurance policies, "following form" provisions are distinguished from "follow the fortunes" clauses. The former "expressly limit[] the reinsurance to the terms and conditions of the underlying policy," while the latter are "somewhat broader than the 'following forms' clause and obligate[] the reinsurer to indemnify the reinsured for any good faith payment of an insured loss." *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1199 (3d Cir. 1995). Thus, American Home is entitled to challenge AEGIS's decision to pay this claim.

As the insured, Oceaneering bears the burden of demonstrating that coverage potentially exists under the American Home policy. *See Canutillo*, 99 F.3d at 701. Because coverage under the American Home policy "follows" the scope of coverage under the AEGIS policy, Oceaneering must establish that coverage properly exists under the AEGIS policy, regardless of AEGIS's coverage decision. In addressing this burden, Oceaneering, relying on declarations from the Claims Handler and Director of Claims assigned to the Okeanos claim, points to language in the AEGIS policy that provides coverage for risks arising out of "Specialist Operations" and "contractual indemnities."[10] Oceaneering also relies on language providing coverage for damage

---

[10]    *See* Defendant's Supplemental Memorandum [Doc. # 34], Exh. A: "Declaration of Richard Oakley," ¶ 13; Exh. B: "Declaration of Colin Williams," ¶ 11; *see also* Defendant's Motion for Summary Judgment [Doc. # 18], Exh. E: "AEGIS Certificate of Insurance," at 3, ¶¶ 3, 4 (This document is not separately paginated; all references are to the page numbers assigned by the Court's electronic docketing system.).

to "fixed and floating objects."

Covered risks for "Specialist Operations" include:

liabilities, costs[,] or expenses incurred by a Member [Oceaneering] who contracts to perform specialist operations, including but not limited to dredging, blasting, pile driving, well stimulation, cable or pipe laying, maintenance or removal, core sampling, depositing of spoil, waste incineration or disposal operations, professional oil spill response or professional oil spill response training[.][11]

The AEGIS policy also provides coverage for "liability for loss of, or damage to, or interference with rights in relation to any fixed or movable property, whether on or above, in or below land or water,"[12] whether Oceaneering's liability arises independently or "under the terms of an indemnity, undertaking[,] or contract."[13]

_____

[11]   Defendant's Motion for Summary Judgment [Doc. # 18], Exh. F: "AEGIS Policy Provisions," at 40.

[12]   *Id.* at 51.

[13]   *Id.* at 54.   Oceaneering also points to language in the AEGIS policy providing coverage for risks arising out of "Drilling Operations."   These risks include:

liabilities, costs[,] or expenses incurred in respect of an entered ship (being a drilling ship or barge or any other ship or barge carrying out drilling exploration, construction or production operations, including any accommodation unit moored on site as an integral part of such operations) and arising out of or during drilling or core sampling or production operations[.]

*Id.* at 40.   It is unclear how coverage for "Drilling Operations" is implicated here, since Oceaneering was merely inspecting a pipeline and was not engaged in actual drilling at the time its employees encountered the shipwreck site.   Thus, to the extent that there is coverage, it must be due to the "Specialist Operations," "fixed and floating property," and/or "contract indemnities" provisions.

AEGIS's claims handlers concluded that "Specialist Operations" encompassed Oceaneering's use of an ROV to conduct, under contract with a third party, underwater inspections of mineral pipelines.[14]  Based on the language of the policy, American Home has provided and the Court finds no grounds on which to dispute that position.[15]  The definition of "Specialist Operations" is not exclusive and includes "maintenance," which is listed in the context of "cable or pipe laying" and "professional oil spill response."  At the time Oceaneering's employees encountered the shipwreck site, they were conducting a pipeline inspection to check the integrity of Okeanos' line and ensure that there were no oil leaks.[16]

American Home points out that coverage under this provision is tied to the existence of a contract, and argues that because Oceaneering's investigation of the shipwreck site was not required under its contract with Okeanos, coverage for damage to the site is not provided for by this provision.  This argument is unavailing. Whether Oceaneering's actual exploration of the shipwreck site was required under

---

[14]   *See* Defendant's Supplemental Memorandum [Doc. # 34], Exh. A: "Declaration of Richard Oakley," ¶ 13; Exh. B: "Declaration of Colin Williams," ¶ 11.

[15]   To the extent the provision may be deemed ambiguous, the Court must construe the language so as to provide coverage. *See, e.g.*, *Lambrecht & Assocs., Inc.*, 119 S.W.3d at 20; *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520.

[16]   *See* Joint Statement of Undisputed Facts [Doc. # 17], ¶ 39; *see also* Defendant's Motion for Summary Judgment [Doc. # 18], Exh. C: "Settlement Agreement and Release," at 1, ¶ E.

the contract is irrelevant to whether Oceaneering caused damage to Okeanos while performing under the contract.  In this case, Okeanos was damaged as a result of Oceaneering's allegedly negligent performance of the contract—namely, due to Oceaneering's decision to deviate from the pipeline right-of-way to investigate, and subsequently disturb, a sonar site that Okeanos had an interest in preserving.[17]  Thus, AEGIS appropriately covered the Okeanos claim under the "Specialist Operations" provision of its policy with Oceaneering.

Alternatively, coverage would be afforded under the AEGIS provision providing coverage for "loss of, or damage to, or interference with rights in relation to any fixed or movable property" anywhere in the world.  Giving this language its plain meaning, the Court concludes that the Okeanos claim is properly covered by this provision.   American Home argues that any claim under the AEGIS policy "anticipate[s] that in the event of a loss[,] the indemnities and insurances will be

---

[17]    In fact, the Oceaneering employee who decided to investigate the sonar site, ROV operator Travis Lee Kolbe, stated in a sworn declaration that:

> It is an accepted practice and procedure for an ROV to investigate a near by [sic] sonar contact made during an inspection, even if such excursion necessitates deviating the ROV away from the immediate area of the item being inspected for the client in an effort to identify the object of the sonar contact.

*Id.*, Exh. B: "Affidavit of Travis Lee Kolbe," ¶ 10.  Except to offer opinion evidence that Oceaneering's conduct with regard to the shipwreck site failed to comply with "best practices" for salvage operations, American Home has not challenged this position.

triggered by a claim brought by someone having a proprietary interest in the property and not by someone having only a remote, attenuated[,] or regulatory interest."[18]  The Court is unpersuaded.  This provision clearly anticipates broad coverage, as evidenced by the use of language providing coverage for loss, damage, *or interference with rights*.  American Home devotes a majority of its briefing to arguing that no one has a proprietary interest in the items associated with the shipwreck site—asserting specifically that no person or entity has *title* to the items.  This argument misses the mark.  The language of this provision does not require that a claim be brought by one having title to the property at issue.  Given, as American Home recognizes, that the MMS has—at a minimum—a regulatory interest in protecting and preserving the shipwreck site,[19] coverage is properly afforded to an insured who causes damage to property associated with that site.

Under federal law, MMS has a right and a duty to ensure that the activities it oversees—including the construction of pipelines in certain extraterritorial waters—do not adversely affect archeological resources and significant historical properties.  *See* National Historic Preservation Act of 1996 § 106, 16 U.S.C. § 470 ("NHPA"); 30 C.F.R. §§ 250.101, 250.105–.106.  Pursuant to its authority under the NHPA, MMS

---

[18]     Plaintiff's Supplemental Brief [Doc. # 35], at 2.

[19]     *See* Plaintiff's Supplemental Brief [Doc. # 35], at 6–9.

can require pipeline right-of-way holders to arrange their operations so as not to damage potential historic properties and can assess penalties when a permit holder fails to do so.  30 C.F.R. §§ 250.194(c), 250.1009(c)(4), (6), 250.1404; *see* NHPA § 110(k), 16 U.S.C. § 470h-2(k).  Indeed, MMS may charge federal permittees for costs related to historic preservation activities even in the absence of any wrongdoing. NHPA § 110(g), 16 U.S.C. § 470h-2(g).

Accordingly, while MMS may not have *title* to a historical property, it does have federally recognized rights that allow it to regulate the conduct of third parties to preserve and protect potentially significant resources.  As a right-of-way holder under permit from MMS, Okeanos assumed a duty, enforceable by federal law, to do no damage to potential archeological resources it encountered while engaged in its underwater operations.   Oceaneering—albeit unknowingly—interfered with Okeanos's and MMS's legal interests in preserving the integrity of the shipwreck site, which is sufficient to trigger coverage under the provision of the AEGIS policy affording coverage for "loss of, or damage to, or interference with rights in relation to any fixed or movable property."[20]

### 2.    Possible Exclusions

---

[20]    Because the Court concludes that coverage is provided under Part B, Section I(a) of the American Home policy, it does not reach whether coverage would also be available under Part B, Section I(c).

Because Oceaneering has established that the AEGIS policy potentially provides coverage for the damage caused to the shipwreck site, the burden shifts to American Home to demonstrate the existence of "an exclusion in the policy [which might] constitute an avoidance of or affirmative defense to coverage." *Canutillo*, 99 F.3d at 701. American Home points primarily to a provision in the AEGIS policy that excludes coverage for certain "rare or precious" items. However, a fair reading of this provision does not support American Home's argument that this "absolute exclusion trumps all other provisions of the [AEGIS] policy . . . ."[21] The provision at issue states that coverage is provided for:

> Loss of or damage to baggage, property[,] and effects save for specie, bullion, precious or rare metals or stone, plate or other objects of a rare and precious nature, bank notes or other forms of currency, bonds or other negotiable instruments, whether the value is declared or not, unless in any such case the Managers [AEGIS] have been notified prior to any such carriage, and any directions made by them complied with, provided that in respect of crew, cover hereunder is limited to their "effects" as defined [elsewhere].[22]

By including language that this provision applies to the specified items, unless AEGIS is notified of their existence "prior to *any such carriage*," this provision is clearly intended to apply to items carried on or by an Oceaneering vessel and not "rare

---

[21]    *See* Plaintiff's Supplemental Brief [Doc. # 35], at 3.

[22]    Defendant's Motion for Summary Judgment [Doc. # 18], Exh. F: "AEGIS Policy Provisions," at 45.

or precious" items encountered in the open sea while on a voyage.  Thus, this provision does not exclude coverage under the facts presented here.

American Home next argues that policy language providing coverage for damage to "fixed and floating objects" is inapplicable because of other language in the AEGIS policy stating that coverage is excluded for "4/4ths Collision and liabilities for damage to fixed and floating objects, to the extent such liabilities or losses are covered by the Assured's [Oceaneering's] Hull and Machinery Policy (or other) for the full Hull and Machinery value."[23]  American Homes argues that this exclusion "trumps any potential for coverage under" the "fixed and floating objects" provision. However, this argument is not supported by the law governing hull and machinery policies.  This type of policy generally provides coverage for damage resulting from a collision between a covered vessel and another vessel or other property.  *See, e.g.*, *Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 829 n.2 (5th Cir. 1986). In fact, the AEGIS policy defines a "Hull policy" as "the Policies effected on the Hull and Machinery of a ship."[24]  Moreover, the exclusion only applies if the insured has a Hull and Machinery policy that would otherwise provide cover for a claim implicating the "fixed and floating objects" provision.  American Home, which bears

---

[23]     *Id.*, Exh. E: "AEGIS Certificate of Insurance," at 40.

[24]     *Id.*, Exh. F: "AEGIS Policy Provisions," at 28.

the burden of establishing the existence of an exclusion to coverage, has produced no evidence that Oceaneering had such a policy, and thus, no evidence that this exclusion is applicable to the Okeanos claim.   Therefore, this provision does not exclude coverage for the claim.

Finally, American Home suggests that following form coverage under the AEGIS policy must track, and is limited by, the indemnification provision of Oceaneering's Master Diving Services Contract with Okeanos, which provides that Oceaneering will indemnify Okeanos for "all damages to or losses of *Third Parties'* property."[25]   American Home argues that this contract indemnity language requires that the claim for recovery be asserted by the title owner of the damaged property. Because neither Okeanos nor MMS can claim title to the shipwreck artifacts, American Home asserts that Oceaneering was not obligated to indemnify Okeanos and that AEGIS improperly tendered payment on the claim.   The Court need not determine the proper interpretation of the Master Diving Services Contract.   Although the meaning of this language may be relevant to a determining whether coverage was provided under the "contractual indemnities" provision of the AEGIS policy,[26] there

---

[25]   *See id.*, Exh. A: "Master Diving Service Contract," at 5–6 (emphasis added).

[26]   *See id.*, Exh. F: "AEGIS Policy Provisions," at 54.  This provision provides cover for "[l]iabilities in respect of risks covered under any [AEGIS policy provision] . . . arising under the terms of an indemnity, undertaking[,] or contract by the [insured] . . . *provided always that*: a particular claim falls within the scope of . . . cover."

is nothing in the language of the "Specialist Operations" or "fixed and floating property" policy provisions requiring that coverage be tied to the *terms*, rather than simply the existence, of an underlying contract between the insured and a third party.[27]

Accordingly, American Home has failed to establish an exclusion to coverage.

### 3.   Conclusion on Existence of Coverage

Because the American Home policy explicitly "follows" the terms and conditions of the AEGIS policy, without any relevant exception,[28] Oceaneering has met its burden of establishing the existence of coverage.  *See, e.g.*, *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 538 (5th Cir. 2002); *Juntunen v. Sea-Con Servs., Inc.*, 879 F.2d 154, 155–56 (5th Cir. 1989); *see also Home Ins. Co. v. Am.*

---

[27]    *See id.*, Exh. F: "AEGIS Policy Provisions," at 40 (providing coverage for "liabilities, costs[,] or expenses incurred by a[n insured] who *contracts* to perform specialist operations" (emphasis added)); 51 (providing coverage for "liability for loss of, or damage to, or interference with rights in relation to any fixed or movable property," whether liability arises independently or "under the terms of a . . . contract").

To the extent American Home now argues that Oceaneering was not obligated under the Master Diving Services Contract to settle with Okeanos, it is notable that American Home expressly declined to intervene in Oceaneering's negotiations with Okeanos regarding the Okeanos claim.  *See id.*, Exh. H: "Letter Detailing American Home's Coverage Decision," at 2 ("Oceaneering should act as a prudent self-insured and take such steps as may be necessary to mitigate further loss during the pendency of coverage deliberations," which would recommence "should [Oceaneering] provide [American Home] with material information or legal authority that warrants a re-thinking of this matter.").

[28]    *See* Plaintiff's Motion for Summary Judgment [Doc. # 20], Exh. H: "American Home Insurance Policy," at Bates No. AIHOPM-044-0000354, -0000356–57.

*Home Prods. Corp.*, 902 F.2d 1111, 1113 (2d Cir. 1990).  American Home has not

identified any exclusion in either the AEGIS policy or its policy with Oceaneering that

would negate coverage.  Thus, the Okeanos claim is covered by the "following form"

provision of the American Home policy.  The Court need not reach whether coverage

would also be afforded pursuant to other policy provisions.[29]

### B.    Scope of Coverage

Having concluded that American Home's insurance policy with Oceaneering

provides coverage for the Okeanos claim, the Court turns to the scope of that

coverage.

Under the "following form" provision of the American Home policy, the scope

of coverage provided by the American Home policy follows the scope of coverage

provided by the AEGIS policy.[30]   The applicable provisions of the AEGIS policy

provide coverage for "liabilities, costs[,] or expenses incurred by a[n insured] who

contracts to perform specialist operations" or "liability for loss of, or damage to, or

interference with rights in relation to any fixed or movable property."[31] The American

---

[29]    For example, the Court does not reach whether there was an "occurrence" causing "property damage" as those terms are used in Part B, Section I(c) of the American Home policy.

[30]    *See* Plaintiff's Motion for Summary Judgment [Doc. # 20], Exh. H: "American Home Insurance Policy," at Bates No. AIHOPM-044-0000348.

[31]    Defendant's Motion for Summary Judgment [Doc. # 18], Exh. F: "AEGIS Policy (continued...)

Home policy provides additional coverage for "Ultimate Net Loss," defined as:

> [T]he total sum which the Assured, or his underlying insurers, or both, become obligated to pay by reason of matters set out in Insuring Agreement I,[32] either through adjudication or compromise, and shall include hospital, medical[,] and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses[,] and investigators and other persons, and for litigation, settlement, adjustment[,] and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding, however, the salaries of the Assured's, or his underlying insurers, permanent employees and general office overhead and also excluding any part of such expenses for which the Assured is covered by other valid and collectible insurance.[33]

First, American Home points out that Oceaneering's settlement with Okeanos for $3,000,000 worth of fully-crewed ROV time is based on market rates for the service, rather than on Oceaneering's actual cost.  Oceaneering's Executive Vice President testified that the actual "cash value" of the services is "somewhere in the neighborhood of a million, . . . could be . . . a million and a half."[34]  Oceaneering has not pointed to any language in either the AEGIS or the American Home policy

---

[31]     (...continued)
Provisions," at 40, 51.

[32]     *See supra* p. 12.

[33]     *See* Plaintiff's Motion for Summary Judgment [Doc. # 20], Exh. H: "American Home Insurance Policy," at Bates No. AIHOPM-044-0000351.

[34]     *Id.*, Exh. M: "Deposition of Oceaneering Executive Vice President Michael Kevin McEvoy," at 74.

providing coverage for losses akin to lost profits.  Nor has Oceaneering cited case law that, under Texas law, lost profits qualify as a "sum [an insured] . . . becomes obligated to pay" under an insurance policy.  As a "following form" excess insurance policy, the American Home policy only provides coverage for liabilities in excess of that covered by the underlying AEGIS policy.  *See, e.g.*, *Feld v. Zale Corp.*, 62 F.3d 746, 749 n.1 (5th Cir. 1995).  The AEGIS policy provided coverage for the first $1,000,000 in damages suffered by Oceaneering (including Oceaneering's deductible). Thus, as a preliminary matter, questions of fact exist whether Oceaneering's liability even implicates the American Home policy.

Next, assuming that the American Home policy is implicated, and notwithstanding open questions about the value of Okeanos claim, American Home argues that it should not be obligated to pay the entirety of the claim, because Okeanos's settlement with MMS does more than merely provide recovery for the value of the broken and lost shipwreck artifacts, which American Home argues is, at most, the only loss that its policy with Oceaneering covers.  American Home focuses primarily on the policy provisions that appear to tie the scope of coverage to the value of the property damaged.  However, the company fails to recognize that the AEGIS policy provides expanded coverage for claims under the "Specialist Operations" provision.  This provision ties the scope of coverage to damages incurred as a result

of the insured's performance of "specialist operations."  Specifically, the policy states that coverage is afforded for "liabilities, costs[,] or expenses incurred" by Oceaneering, provided Oceaneering has "contract[ed] to perform specialist operations."[35]  Accordingly, Oceaneering contends that the scope of coverage under the AEGIS policy—and due to the following form provision, under the American Home policy—is expansive and covers the entirety of Oceaneering's settlement with Okeanos.

In support of this position, Oceaneering cites case law establishing that, at least in the context of environmental cases, insurance provisions providing coverage for "all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property" should be interpreted to include coverage for response costs, cleanup costs, and other remediation costs because of potential or actual legal proceedings.  *See e.g.*, *Bituminous Cas. Co. v. Vacuum Tanks, Inc.*, 75 F.3d 1048, 1053 (5th Cir. 1996); *see also Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 288–89 (5th Cir. 2005).  These cases hold that under Texas law, which interprets ambiguities in insurance policies in favor of coverage for the insured, "costs incurred by a policy holder in complying with governmental directives in environmental matters . . . are 'damages'" for purposes of general liability clauses in insurance

---

[35]    Defendant's Motion for Summary Judgment [Doc. # 18], Exh. F: "AEGIS Policy Provisions," at 40.

policies. *Dayton Indep. Sch. Dist. v. Nat'l Gypsum Co.*, 682 F. Supp. 1403, 1411 n.24 (E.D. Tex. 1988), *rev'd on other grounds sub nom. W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865 (5th Cir. 1990).

Oceaneering argues that the costs associated with raising the shipwreck—one of the tasks assigned to Texas A&M University by virtue of the Okeanos-MMS settlement—are directly tied to Oceaneering's disturbance and destruction of artifacts at the shipwreck site and, thus, qualify as "cleanup" costs. The Court agrees only in part. In the unique context of an archeological property located on the ocean floor—which federal law closely regulates to protect from disturbance or destruction by right-of-way holders and, by extension, their contractors—costs associated with protecting the site from additional harm are analogous to costs associated with cleaning up environmental damage caused by an insured. In both cases, the damages reflect the cost of complying with governmental directives in unique contexts—the environment and historical property management—in which the government has taken an active role. Accordingly, the Court rejects American Home's characterization of these costs as mere "economic losses" for which coverage is not afforded, especially given the expansive scope of coverage provided by the "Specialist Operations" provision of the underlying AEGIS policy.

However, while the Court agrees that coverage extends to liabilities resulting

from Oceaneering's performance of "specialist operations"—here, from its performance of its contract to inspect Okeanos's pipeline—questions of fact exist whether the full sum Okeanos seeks to recover by its claim is limited to such liabilities.  The Okeanos claim was negotiated in light of Okeanos's agreement with MMS to pay nearly $5 million to Texas A&M University to conduct a variety of tasks associated with excavating, retrieving, and curating the shipwreck artifacts.  The Okeanos-MMS settlement agreement released Okeanos from civil, administrative, and criminal liability arising from *both* of its contractors' failures—first, from the Shell contractor's failure to inform MMS that it located the shipwreck site,[36] and second, from Oceaneering's subsequent incursion into the site.[37]  Thus, how much of the settlement sum is a reflection of Oceaneering's conduct is unclear.  Similarly, the $4.87 million paid by Okeanos to Texas A&M University was calculated based upon a University proposal to not just protect the shipwreck artifacts, but also to raise them from the ocean floor and to fund academic research and create marketing materials related to the wreck.  Whether these costs can fairly be described as liabilities resulting from Oceaneering's operations, rather than, perhaps, punitive costs assessed against Okeanos for the totality of its and its contractors' failures to comply with

---

[36]     *See* Defendant's Motion for Summary Judgment [Doc. # 18], Exh. C: "Settlement Agreement and Release," at 1, ¶¶ B–D.

[37]     *Id.* ¶ E.

federal regulations, cannot be determined from the summary judgment record.

Thus, while coverage is afforded to Oceaneering under the American Home policy, the issues whether Oceaneering's liabilities implicate the policy and, if so, the extent to which they do, present questions of material fact that must be decided by a factfinder at trial.  Though Oceaneering is entitled to summary judgment on the question whether the American Home policy covers the Okeanos claim, neither party is entitled to a declaration of the amount due under the policy.

## IV.   <u>CONCLUSION</u>

Based on the foregoing, it is hereby

**ORDERED** that Defendant Oceaneering International, Inc.'s Motion for Summary Judgment [Doc. # 18] is **GRANTED IN PART and DENIED IN PART**. The American Home policy provides coverage for the claim at issue in this case. However, whether this claim exceeds the policy limits of the AEGIS policy, and whether it is limited to "liabilities, costs, and expenses" incurred as a result of Oceaneering's "specialist operations," are questions of fact that cannot be resolved on the summary judgment record.  It is further

**ORDERED** that Plaintiff American Home Assurance Company's Motion for Summary Judgment [Doc. # 20] is **DENIED**.  It is further

**ORDERED** that Defendant Oceaneering International, Inc.'s Motion to Strike

Experts or, Alternatively, Motion in Limine [Doc. # 26] is **DENIED WITHOUT PREJUDICE**.  The Court did not rely on the challenged evidence in reaching its decision herein.  Should American Home seek to introduce the evidence at trial, the Court will, upon Oceaneering's request, reconsider this motion as a motion in limine.

 **SIGNED** at Houston, Texas, this 22nd day of **May, 2008**.

          Nancy F. Atlas

        United States District Judge